IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| BRIAN F. DURKIN and<br>CRAIG W. RICHARDS, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION FILE |
| | ) | |
| v. | ) | NUMBER 1:10-cv-2262-TCB |
| | ) | |
| ANN PLATZ and RACHEL<br>THOMAS HALE, | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R

The relationship between Defendants Ann Platz and Rachel Thomas Hale and Plaintiffs Brian F. Durkin and Craig W. Richards started off amicably enough.  Desiring to adapt their unpublished manuscript "The Snow White Ladies of the Third Week" into a movie, Defendants decided to join forces with Plaintiffs, who have experience in the movie business and had recently formed a production company.

Plaintiffs explained to Defendants that the first step in making their dream a reality was to write a screenplay.  The parties determined that

Plaintiffs would write the screenplay and executed a contract to that effect. The parties now dispute the scope of that agreement.

Plaintiffs contend that in addition to being a contract for the parties to create a screenplay together, the contract also evidences the parties' intent to form a partnership to produce the screenplay into a "Snow White Ladies" movie.  Plaintiffs claim Defendants breached the contract, as well as their fiduciary duty as partners, when Defendants refused to work with them to develop a film based on the screenplay and feigned dissatisfaction with the screenplay, despite months of plentiful praise.  Additionally, Plaintiffs contend that under the contract they are co-owners of the screenplay and therefore have the right to use their screenplay to make a movie regardless of whether Defendants grant them permission to do so.

Defendants, however, insist that the parties never formed a partnership to make a movie based on the screenplay.  According to them, the parties' contract was simply for the creation of the screenplay: Defendants were to pay Plaintiffs $8,000 and perform as editors of the first draft, and Plaintiffs were to write a screenplay to Defendants' satisfaction. They argue that they have paid Plaintiffs $8,000 and edited the first draft and thus have no further obligation to them.  Moreover, Defendants

2

contend that Plaintiffs cannot show any ownership interest in the screenplay and Plaintiffs cannot make a "Snow White Ladies" movie without Defendants' permission.

This case comes before the Court on Defendants' second motion for summary judgment [89] and motion for a hearing [109] and Plaintiffs' *Daubert* motion to exclude the testimony of Defendants' expert, David Blakesley [81].

## I.    Background[1]

---

[1] The following facts are undisputed, unless otherwise indicated.  Although Defendants submitted a "statement of undisputed material facts," many of those "facts" are not included within the Court's statement of facts because they (1) are immaterial, (2) are not supported by the evidence cited, (3) cite to a pleading rather than evidence, (4) are legal conclusions rather than facts, or (5) are disputed.

The Court also notes that Defendants' tactic of misrepresenting the facts that their evidentiary citations allegedly support, and providing copious citations for a single alleged fact, needlessly resulted in a waste of the Court's time and resources, delaying disposition of this motion.  In their statement of undisputed material facts, Defendants often supplied as many as thirty citations to support a single "undisputed material fact." On multiple occasions, however, none of the numerous citations supported the stated fact.

For example, "fact" number fifteen of Defendants' "statement of undisputed material facts" states, "Durkin has been an actor who has had minor (supporting) parts in film and television projects, *with little personal commercial success*." (Emphasis added.)  In support of this "fact," Defendants cite sixteen different portions of Durkin's deposition testimony.  However, at no point in his deposition did Durkin testify that he has had "little personal commercial success."  To the contrary, Durkin testified that he has been successful in the film industry since moving to Atlanta and has secured roles in several television series and two major motion pictures.  Thus, the statement that Durkin has had "little personal commercial success" is not a fact based on the evidence, but instead represents Defendants' opinion of Durkin's acting career based on Durkin's testimony.

### 1.    The Parties' Budding Relationship

In 2005, Defendants wrote "The Snow White Ladies of the Third Week."  It is a dramatic comedy centering on an exclusive bridge club known as the Snow White Ladies of the Third Week located in the small, traditional fictional Southern town of St. Bartholomew.[2]  On January 30, 2006, Defendants filed a copyright registration of their unpublished manuscript, and on June 14, 2010, they filed a second copyright registration for the revised manuscript.

After completing the manuscript, Defendants became interested in making it into a movie.  Platz was introduced to Durkin and gave him a copy of the manuscript to review.  After reading the manuscript, Durkin sent Platz an email in January 2008 telling her, "I have a visual of this film and I believe it's because of how well you and Rachel painted the picture . . .

---

[2] According to the manuscript's prologue, the Snow White Ladies of the Third Week have met religiously every third Thursday of each month for the past thirty-three years.  The prologue further explains that the origin of the Snow White part of the club's name is unknown to the townspeople of St. Bartholomew; some think that Snow White "came from the founders who all had snow white hair, wore white gloves, and owned white French poodles," while "[o]thers speculate it has something to do with the exquisite snow white cakes they serve at bridge gatherings."  The final sentences of the prologue hint at the story's conflict: "the Snow Whites were somewhat oblivious to most things that occurred on, literally, the other side of the tracks.  But their Edenesque life in St. Bartholomew is about to change.  A slithering snake is about to raise its venomous head."

. I would love nothing more than to be tucked away in a small southern town for 3 or 4 months to shoot this."

A year and a half later, in August 2009, Durkin reached out to Platz to let her know that he and Richards were putting together a production company.  In that conversation, he told her that as a first step to making a movie, they would need to turn Defendants' manuscript into a screenplay.

In September 2009, Platz emailed Durkin, "[W]e are thrilled that you and Mary Catherine [Durkin's wife][3] want to consider producing Snow White Ladies."  Durkin then forwarded Platz an email from Richards, in which Richards said that Plaintiffs "would need to contract the 'rights' to shop this project, and yes it needs to be exclusive."

On September 28, 2009, Richards sent an email to Platz introducing himself and telling her that he and Durkin "would like to propose to you our thoughts concerning the desire to work with you and move this project to the next stage, a 'pitch-able' feature film package."  Richards then included a "task list": "A. Write an adaptation of the manuscript into a script.  B. Define the location and look of the project.  C. Research a director and casting short list.  D. Create a producer's preliminary budget and schedule.

---

[3] This is the only time the parties reference Mary Catherine.  There is no record evidence that she ever actually became involved in the project.

E. Submit various Business/Creative/Investor license and registrations."
As far as a screenplay, Richards gave Defendants two options: "[p]ay an
established writer to create a 'first pass' script" or "We write the adaptation
together!"  In subsequent emails, the parties exchanged casting ideas for
the film.

### B.    The Blossoming of the Screenplay

In early October 2009, Richards prepared an initial draft of an
agreement and submitted it to Plaintiffs.  Platz gave the draft to an attorney
friend to review.  Platz's friend made changes, including adding language
that "Copyright Holders shall own the script."  Platz emailed the edited
draft to Plaintiffs, and said, "I am so excited about this partnership!"  After
receiving Defendants' changes, Plaintiffs further revised the agreement by
editing Defendants' language to read "Copyright Holders and
Writers/Producers shall own the script in full partnership" and returned
the new draft to Defendants.

At this point, Plaintiffs had already begun writing the screenplay even
though the parties had not actually signed an agreement, and on October
12, Durkin sent the first twenty-six pages of Plaintiffs' first draft.  Platz
responded, "[A]bsolutely wonderful . . . great job . . . guys!"

The next day, Durkin emailed Platz the next thirty pages of the first draft.  Platz responded, "[G]reat!!!!!!"  That same day, Plaintiffs and Defendants signed a finalized agreement.  The one-page contract reads in its entirety as follows:

Memorandum of Agreement
BETWEEN
Ann Platz and Rachel Thomas Hale: The Third Week Brigade, LLC
AND
Craig Richards and Brian Durkin

Ann Platz and Rachel Thomas Hale ("Copyright Holders") under the Georgia Corporation: The Third Week Brigade, LLC and Craig Richards and Brian Durkin ("Writers/Producers") agree to enter into this Agreement for the creation of a long form feature film script adaptation of the literary property entitled "Snow White Ladies of the Third Week."

The period of performance for this Agreement shall be [October 13, 2009] through satisfaction of Copyright Holders and/or date of first talent, creative or development attachment, not to exceed [October 13, 2010].

Copyright Holders agree to:
1.    Reimburse Writers/Producers up to $[8,000] for above-referenced project; [in two installments: $4,000 upon agreement, balance payable upon completion of first draft submission]
2.    Perform as Editors for this first draft/pass of adaptation cycle, October 12-22, 2009.

Writers/Producers agree to:

1.   Create a first pass full feature film script adaptation of the literary property entitled "Snow White Ladies of the Third Week" to the satisfaction of the copyright holders.
2.   Refer all work daily via electronic or verbal communications during adaptation cycle.
3.   Submit a Producers top sheet production budget no later than December 22, 2009.

Both institutions agree to the following:
1.   Modifications to this Agreement will be made by mutual agreement in writing.
2.   Writers Guild of America EAST registration submission.
3.   Copyright Holders and Writers/Producers shall own the script in full partnership.

By signing this agreement both institutions agree to be active partners and agree to abide by this agreement.

In the "Copyright Holders" signature block, Platz and Hale signed and dated the agreement, and Durkin and Richards signed and dated the agreement as the "Writers/Producers."  Pursuant to their agreement, Defendants paid Durkin and Richards $2,000 each upon signing the agreement.

Three days after executing the contract, Durkin emailed Defendants another seventy pages of the screenplay.  Platz responded, "Bravo!  I love it soooooo much . . . I do not know what we will have to shave off to make it 2 [&] ½ hours of film . . . I love it all.  You two are doing an amazing job!"

On October 27, Plaintiffs submitted the first pass of the screenplay, and Defendants paid Plaintiffs the remaining $2,000 each.  The parties continued to work on the screenplay to create a "shooting script."  Plaintiffs submitted revised portions of the screenplay to Defendants, and Defendants edited the revisions.

On November 12, Hale emailed Plaintiffs, "I am thrilled to be working with you all on this project and have the utmost confidence in your guidance and direction."  On December 22, Plaintiffs emailed Defendants to notify them that they had completed a first draft of the screenplay and would be delivering it to Defendants.  After reviewing the draft, Platz responded, "Great genius . . . You guys are awesome!  Love the funny stuff you added!"  On December 30, Hale sent Plaintiffs an email, this time stating, "[Platz] and I have read and discussed the script nearly line by line.  You all have done a magnificent job and we love it."

On January 5, 2010, Durkin emailed Platz, Hale and Richards, "[W]e believe we should move forward with the script as it is.  All the little 'tweaks' we are talking about can be covered in revisions in the pre-production phase."  Platz replied, "I agree.  I think it's time to move it forward.  I love what you have created with the script.  I agree that we have

9

something very special.  The world needs to laugh.  I know the story will be tweaked more when it's time to refine more."

Plaintiffs made a few more adjustments to the screenplay and on January 11, 2010 submitted another version to Defendants.  That same day, Plaintiffs registered that version of the screenplay with the Writers Guild of America.

### C.    The Winter of Defendants' Discontent

In January 2010, Platz asked Plaintiffs to set up a meeting with her neighbor, Sean Adorno, telling them that Adorno raised money for films. On January 28, Plaintiffs attended the meeting where Adorno told them that he could obtain start-up money for a film based on the screenplay.

In February, Plaintiffs began putting together a budget for the film and a private placement memorandum ("PPM") that would be used to raise money to produce the film.  On March 6, Plaintiffs emailed Adorno about the PPM.  However, at that point, unbeknownst to Plaintiffs, something had shifted in Plaintiffs and Defendants' relationship: when Adorno forwarded Plaintiffs' email to Platz, she replied, "[Durkin] is going to be surprised when he hears from our attorney."

In March, Defendants stopped talking to Plaintiffs entirely.  That is, until March 30, when Defendants sent Plaintiffs a work-for-hire agreement regarding the screenplay.  Plaintiffs responded on April 16, through a letter from their attorney, Becky Patrick, rejecting that agreement.  In reply to Patrick's letter, Defendants' attorney Scott Sanders sent another letter on April 29 formally notifying Plaintiffs that Defendants (1) rejected the screenplay as unsatisfactory and unmarketable; (2) did not want to use the screenplay for a movie; and (3) were terminating any further relationship with Plaintiffs.

On May 28, 2010, Plaintiffs filed a copyright registration for the original screenplay, listing themselves as the screenplay's authors and copyright owners.  Durkin testified in his deposition that he registered the screenplay with Platz's permission.  However, Platz testified in her deposition that Plaintiffs did not tell Defendants that they were registering the screenplay solely in Plaintiffs' names.

### C.    Procedural History

On July 20, 2010, Plaintiffs filed this action.  In their second amended complaint, they seek a declaratory judgment that (1) they own a valid and enforceable copyright in the screenplay; (2) the screenplay does

not infringe any copyright owned by Defendants; and (3) Plaintiffs are entitled to market and produce a film version of the screenplay without any interference from Defendants.

Plaintiffs also assert claims for breach of fiduciary duty, breach of contract, quantum meruit and specific performance. In addition to actual damages, Plaintiffs seek their attorneys' fees and punitive damages.

On May 21, 2012, Plaintiffs moved to exclude the testimony of Defendants' expert, David Blakesley, because (1) Defendants did not timely disclose Blakesley's expert report, and (2) Blakesley's testimony fails under Federal Rule of Evidence 702 and *Daubert*.

On June 11, Defendants filed a motion for summary judgment.[4] Defendants contend that there is no genuine dispute as to any material fact on any of Plaintiffs' claims.

---

[4] This is actually Defendants' second motion for summary judgment. In their first motion for summary judgment, Defendants failed to comply with Local Rule 56.1B(1)'s requirements regarding Defendants' statement of undisputed material facts. In its May 25, 2012, Order denying Defendants' motion without prejudice and granting them leave to refile their current motion, the Court explained,

> Under Local Rule 56.1B(1), a summary judgment movant shall include a "separate concise numbered statement of the material facts as to which the movant contends there is no genuine issue to be tried. *Each material fact must be numbered separately and supported by a citation to evidence proving such fact.*" (Emphasis added.) A review of Defendants' statement of undisputed material facts shows that they have failed to comply with the Rule 56.1B(1). The majority of the paragraphs

II.    Motion to Exclude Blakesley's Testimony

In support of their motion for summary judgment, Defendants rely upon the testimony of Blakesley, an English professor at Clemson University.  According to Defendants, Blakesley would testify at trial as to whether Plaintiffs' contributions to the screenplay are copyrightable.  Specifically, Defendants argue that Blakesley would testify that Plaintiffs did not add any significant or original material in preparing the screenplay

---

within Defendants' statement contain multiple statements and multiple citations with no indication of which citation supports which statement.

For example, paragraph 10 contains ten sentences.  At the end of the ten sentences, there is a list of fifteen citations.  There is no way for Plaintiffs or the Court to know which citation supports which fact without culling through the exhibits referenced by the fifteen citations.  Such an exercise would be laborious and pointlessly time-consuming for Plaintiffs, and a waste of the Court's resources.

In this motion, Defendants remedied the deficiency of their former motion by providing citations for each sentence.  However, as explained above, they still failed to follow Rule 56.1B because their citations often (1) are immaterial, (2) are not supported by the evidence cited, (3) cite to a pleading rather than evidence, (4) are legal conclusions rather than facts, or (5) are disputed.

Additionally, in this motion Defendants failed to follow Local Rule 5.1C, which requires that computer documents be prepared in either "Times New Roman (at least 14 point), Courier New (at least 12 point), Century Schoolbook (at least 13 point) or Book Antigua (at least 13 point)."  The footnotes (which are barely legible) in Defendants' brief are 7 point font—obviously much smaller than what is mandated by the Local Rules.

Despite these inadequacies, given the age of this case and the fact that Defendants' statement of undisputed material facts filed in support of their current motion is at least workable, the Court did not require Defendants to file yet another motion for summary judgment.

and are not entitled to any copyright interest in the screenplay as a derivative work.

Plaintiffs move to exclude Blakesley's testimony on two bases.  First, Plaintiffs contend that the Court should strike the expert report because Defendants disclosed their expert and proffered his report over two months after the close of discovery in violation of the Federal Rules of Civil Procedure and this Court's Local Rules.  Second, Plaintiffs argue that Blakesley's testimony should be excluded under Federal Rule of Evidence 702 and *Daubert* because he is not qualified, he bases his opinion on unreliable methodology, and his proffered testimony is irrelevant.

Additionally, Plaintiffs move for sanctions, arguing that due to Defendants' failure to comply with disclosure deadlines, the Court should award them their attorneys' fees in bringing their motion to exclude.

## A.    Defendants' Late Disclosure of Blakesley

Plaintiffs first contend that the Court should strike[5] Blakesley's report because Defendants filed the report two months after the close of discovery in violation of Federal Rule of Civil Procedure 26 and Local Rule 26.2C.

---

[5] Defendants argue that Plaintiffs' motion to strike is improper because Federal Rule of Civil Procedure 12 only authorizes the striking of pleadings.  But Plaintiffs have not moved to strike Blakesley's expert report pursuant to Rule 12.  Plaintiffs move to

Rule 26(a)(2)(D) requires parties to "make [expert] disclosures at the times and in the sequence that the court orders."  Pursuant to Local Rule 26.2C, a party desiring to use expert testimony "shall designate the expert sufficiently early in the discovery period."  The purpose of this rule is so the opposing party has the "opportunity to depose the expert and, if desired, to name its own expert sufficiently in advance of the close of discovery so that similar discovery deposition of the second expert might also be conducted prior to the close of discovery."  LR 26.2C, NDGa.  Local Rule 26.2C further provides that a party who fails to comply with the expert disclosure requirements "shall not be permitted to offer the testimony of the party's expert, unless expressly authorized by court order based upon a showing that the failure to comply was justified."

Defendants readily admit that they filed their disclosures late.  However, they argue that their failure to comply with Local Rule 26.2C was justified because (1) filing their disclosures late was unavoidable, (2) their actions do not prejudice Plaintiffs, (3) Blakesley's testimony is imperative in this case, and (4) the late filing was due to excusable neglect.

---

strike the report based on Defendants' failure to timely designate experts in compliance with the Local Rule 26.2C and Federal Rule of Civil Procedure 26.  Motions to strike or exclude on this basis are proper.  *See, e.g., Adams v. Lab. Corp.*, No. 1:10-cv-3309-WSD, 2012 WL 370262, at *5 (N.D. Ga. Feb. 3, 2012).

It seems that Defendants' first and fourth reasons are one in the same: their neglect to timely file their expert disclosures is excusable because doing so was unavoidable.  In their brief in opposition to Plaintiffs' motion, Defendants contend that "Plaintiffs [sic] identification early on of the alleged original material they claim to have added would possibly determine whether an expert would be a necessary expense . . . ."  In essence, Defendants argue that Plaintiffs' delay in identifying the original material that they claim to have added to the screenplay delayed Defendants in deciding whether they needed an expert.  This argument— that Plaintiffs have failed to identify what original material they claim to have added in creating the screenplay—is one the Court has heard on numerous occasions.  Defendants now attempt to recycle this overworked argument yet again by offering it as a justification for their inability to follow the Local Rules.

Contrary to Defendants' contention, Plaintiffs did identify "early on" the material they claim they added to the screenplay.  Following a July 14, 2011, telephone conference in which the Court ordered Plaintiffs to answer Defendants' interrogatory requesting Plaintiffs to identify the original material they claim to have contributed to the screenplay, Plaintiffs served

Defendants with a redline[6] copy of the manuscript showing the changes from the manuscript to the screenplay.  Additionally, Plaintiffs filed a supplemental response that includes citations to page numbers of the redline and summarizes all changes made to the manuscript in creating the screenplay.  Nonetheless, Defendants, unsatisfied with Plaintiffs' response, argued to the Court that Plaintiffs had not complied with the Court's July 14 order.  The Court disagreed and in October 2011 entered an order finding that Plaintiffs had complied with Defendants' request.  Despite the Court's ruling, Defendants continued to argue that Plaintiffs' submission was inadequate.  And at Richards's deposition, Defendants' counsel insisted that Richards was refusing to identify the original material Plaintiffs added to the screenplay.[7]

---

[6] The redline copy compares the manuscript with the screenplay.  To create the redline, Plaintiffs used a tracking software that shows all additions, omissions and changes between the manuscript and the screenplay.

[7] During the deposition, Defendants' counsel Scott Sanders contacted the Court to complain that Richards had failed to supply him with answers that Sanders found satisfactory.  After reviewing the deposition transcript, the Court sent counsel an email in which it (1) found that Sanders had violated the Court's Instructions to Counsel and Litigants [2] by repeatedly interrupting the witness and arguing the merits of the case with Richards and his attorney, and (2) advised Sanders, "If the Defendants contend that the Plaintiffs' evidence is insufficient to establish their claimed copyrights, Defendants can make that argument in a motion for summary judgment."

Defendants now contend that they did not know they needed an expert until Plaintiffs' depositions in February 2012 because that was the point when it became apparent that Plaintiffs would not identify the material they claim to have added.  The Court disagrees.  Since August 2011, Defendants have been in possession of the material that Plaintiffs contend they added to the manuscript in creating the screenplay.  Further, Defendants have always found Plaintiffs' response adequate, despite the Court's holding to the contrary.  Thus, even if Plaintiffs' failure to supply Defendants with an acceptable response necessitated Defendants' retaining an expert, Defendants should have known of that need since August 2011— a time well within the discovery period.[8]  Consequently, Defendants cannot establish that their late disclosure was justified on this basis.

As to Defendants' remaining arguments, neither relates to Defendants' justifications for their delay.  Defendants contend that the Court should excuse their late disclosure because Plaintiffs will not suffer any prejudice.  This Court flatly rejected that argument in *Fedrick v. Mercedes-Benz USA, LLC*, 366 F. Supp. 2d 1190, 1195 (N.D. Ga. 2005). There, the Court explained that the standard for striking untimely expert

---

[8] After two extensions, the discovery period expired on February 17, 2012.

testimony is not whether the opposing party is prejudiced, but whether the proffering party's failure to comply was justified.  Thus, Defendants' contention is without merit.  Likewise, Defendants' argument that Blakesley's "testimony is imperative" fails.  Again, the relevant standard is justifiable delay, and the necessity of Blakesley's testimony in no way relates to Defendants' justifications for their late disclosures.[9]  Thus, Defendants have failed to show that their delay in filing their expert disclosures was justifiable.

Pursuant to Federal Rule of Civil Procedure 37(c)(1), "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  As Local Rule 26.2C explains, the point of this Court's expert-disclosure rule is for the opposing party to have an adequate opportunity to depose the expert and name its own counter-expert.  By filing their expert disclosures two months after the close of discovery, Defendants deprived Plaintiffs of this opportunity.  *See Reese v. Herbert*, 527 F.3d 1253, 1266 (11th Cir. 2008) ("Because the expert witness

---

[9] Further, Plaintiffs cannot establish that Blakesley's testimony is "imperative" because, as explained below, Blakesley's testimony is inadmissible.

discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, compliance with the requirements of Rule 26 is not merely aspirational.") (citations omitted). Consequently, because Defendants have failed to show that their failure to comply with Local Rule 26.2C was substantially justified, Blakesley's testimony will be excluded. *See Id.* at 1266 (affirming district court's exclusion of expert testimony pursuant to Local Rule 26.2C where party failed to show substantial justification for filing expert disclosure seven weeks after close of discovery).

### B.    Award of Attorneys' Fees

In addition to the exclusion of Blakesley's testimony, Plaintiffs move for sanctions in the form of their attorneys' fees in preparing this motion.

Rule 37(c)(1) also allows a court to "order the payment of the reasonable expenses, including attorneys' fees" caused by a party's failure to identify a witness as required by Rule 26.  This Court has found that it "has the power to impose sanctions, including the award of attorney's fees, for failures to properly disclose expert witnesses." *Morrison v. Mann*, 244 F.R.D. 668, 676 (N.D. Ga. 2007).  "Moreover, the Court has particularly

broad discretion in sanctioning discovery abuse." *Id. citing Malautea v. Suzuki Motor Co.,* 987 F.2d 1536, 1542 (11th Cir. 1993).

During the parties' last discovery dispute, the Court warned counsel that "future discovery disputes will likely be resolved with serious sanctions being imposed upon the erring side and/or their counsel." In light of Defendants' counsel's past failure to comply with the Local Rules, this Court's warning to counsel, and the Court's conclusion that Defendants' delay in disclosing their expert was not justified, the Court agrees with Plaintiffs that Defendants should be sanctioned.

The Court will therefore grant Plaintiffs' request for attorneys' fees in preparing their motion to exclude Blakesley's testimony. Such recovery, however, is limited to the fees Plaintiffs incurred in arguing that Defendants' expert disclosure was untimely, as only that portion of their brief was caused by Defendants' failure to comply with Rule 26(a). The remaining portion of Plaintiffs' motion is dedicated to arguing that Blakesley's testimony is inadmissible pursuant to Rule 702 and *Daubert*; Plaintiffs have not argued that Rule 37(c)(1) provides a basis for recovering

their attorneys' fees incurred related to those grounds for excluding
Blakesley's testimony.[10]

Plaintiffs shall submit to the Court within fourteen days of this order
their attorneys' fees and expenses incurred in addressing this issue before
the Court.  Defendants shall have fourteen days from the date of Plaintiffs'
filing in which to file a brief and/or evidence in opposition to Plaintiffs'
filing, and Plaintiffs shall have ten days from that date within which to file a
reply brief.

### C.     Admissibility of Blakesley's Testimony Under Rule Federal Rule of Evidence 702 and *Daubert*

Even if Defendants could show justifiable delay, Blakesley's testimony
is nonetheless inadmissible under Rule 702 of the Federal Rules of
Evidence, which governs the admissibility of expert testimony.  Rule 702
provides:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in the form
> of an opinion or otherwise if:
> (a)     the expert's scientific, technical, or other specialized
>         knowledge will help the trier of fact to understand
>         the evidence or to determine a fact in issue;
> (b)     the testimony is based on sufficient facts or data;

---

[10] Should Plaintiffs file a motion for an award of those attorneys' fees, the Court
would entertain such a motion.

    (c)    the testimony is the product of reliable principles and methods; and

    (d)    the expert has reliably applied the principles and methods to the facts of the case.

In applying Rule 702, the Supreme Court has exhorted trial courts to scrutinize expert testimony and to exclude unreliable expert evidence. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999). The Court must serve as a gatekeeper, "screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007).

Accordingly, the Court must consider whether (1) the expert is qualified to testify regarding the matters he intends to address; (2) the expert's methodology is sufficiently reliable under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); and (3) the expert's testimony assists the trier of fact to understand the evidence or to determine a fact in issue. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1309 (11th Cir. 1999). Defendants, as the proponent of Blakesley's testimony, bear the burden of showing that the three criteria are met. *United States v. Frazier*, 387 F.3d 1244, 1260 (2004).

### 1.   Blakesley's Qualifications

Blakesley is an English professor at Clemson University, with a specialization in rhetoric, linguistics and literature.  He states in his report that he is the founder and CEO of Parlor Press, a scholarly publishing company based in Anderson, South Carolina.  He further states that he has written in published articles and books about the nature and teaching of writing and literature, the state of publishing, research methodology and ethics, film and literary analysis, copyright and plagiarism, and the adaptation of literary works into film.

Defendants retained Blakesley to answer the question, "As an adaptation of the Platz-Hale SWL Manuscript, does the Screenplay include any original material not present in the Platz-Hale SWL Manuscript, and, if so, is the material significant and thus separately copyrightable?"  In short, Defendants retained Blakesley to analyze the copyrightability of Plaintiffs' screenplay.

Under Rule 702, an expert may be qualified by knowledge, skill, experience, training or education.  According to Plaintiffs, Defendants have not established that Blakesley is an expert in the field of copyright law.  Specifically, Plaintiffs contend that Blakesley is not a lawyer and thus lacks

the qualifications to offer any opinions as to whether Plaintiffs have copyright protection in their screenplay.  In response, Defendants argue that Blakesley "is a literary and plagerism [sic] expert fully qualified to render the opinions contained in his expert report."

Although Blakesley may be an expert in plagiarism, Defendants fail to point to any qualifications rendering Blakesley an expert in the field of copyright law, and neither his expert report nor his curriculum vitae demonstrates an expertise in copyright law.  While his expert report states that he deals with copyright issues in his role as CEO of his publishing company, this hardly renders him an expert in the field of copyright law. Further, despite his assertion in his expert report that he has written articles in the area of copyright, the word "copyright" does not even appear in his twenty-one page curriculum vitae.  Thus, Defendants have failed to show that Blakesley is qualified to render an opinion regarding the copyrightability of the screenplay.  *Cf. Crom Corp. v. Crom*, 677 F.2d 48, 50 (9th Cir. 1982) (expert with "long training and experience in patent law" was qualified to testify regarding the "interpretation and application of patent claims").

Nevertheless, Defendants argue that "[a]ny expressed weakness that [Plaintiffs][11] may perceive in Blakesley's qualifications to testify as an expert witness, or his expert testimony and opinions, is not the basis for exclusion of testimony."  In support of this assertion, Defendants cite *Daubert* for the contention that weaknesses in an expert's qualifications are "the subject of cross-examination to be weighed by the jury."

Despite Defendants' extensive discussion of *Daubert* in their brief in opposition to Plaintiffs' motion to exclude,[12] they seem to have little understanding of *Daubert*'s actual application.  In arguing that Blakesley should be allowed to testify because Plaintiffs can attack any weaknesses in his qualifications during cross-examination, Defendants presumably[13] rely on the Supreme Court's statement in *Daubert* that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking

---

[11] Defendants' brief actually states "[a]ny expressed weakness Defendants may perceive . . . ."  The Court assumes Defendants meant to say "Plaintiffs."

[12] As Plaintiffs argue, Defendants' opposition brief "is essentially an essay on *Daubert* that does not relate the law to the specifics of this case."

[13] Defendants did not directly cite the language they relied on for the proposition; they simply cited the page number.

shaky but admissible evidence."  509 U.S. at 596.  Defendants' reliance on this language in misplaced.

The problem with Defendants' interpretation is that the Supreme Court has not said that cross-examination can be used to attack *any* "shaky" expert testimony—only "shaky but admissible" testimony.  *Id.*  To arrive at their proffered interpretation, Defendants gloss over the key word "admissible."  Were the Court to follow Defendants' interpretation and allow them to proffer testimony of an unqualified expert on the basis that Plaintiffs could attack any weaknesses during cross-examination, Rule 702 and *Daubert*'s purpose of having the court act as gatekeeper of experts "whose expertise is irrelevant to the issue at hand" would be eviscerated. *Corwin*, 475 F.3d at 1250.  This, the Court will not do.

The Court therefore concludes that Blakesley is not qualified to render an opinion regarding the copyrightability of the screenplay.

### 2.  Blakesley's Methods

Considering Blakesley's lack of expertise in the field of copyright law, it is not surprising that he applies an unreliable methodology.  In determining whether the screenplay is copyrightable, Blakesley analyzed whether Plaintiffs had made "significant" additions to the manuscript.  In

his report, he defines a significant addition as one that "would need to be at the level of an entire scene, major character, or plot event that would alter the reader's/viewer's reception of the work's focus and theme, rendering a different interpretation from that afforded by [Defendants'] manuscript." He explains that "substitution of a word here and there, rearrangement of a character's spoken dialogue, or the dramatization of a character's thoughts in the novel as action in the screenplay" do not qualify as significant additions.

First, it is common sense that a derivative work should not have to "alter the reader's/viewer's reception of the work's focus and theme" in order to be copyrightable. Such a standard would often defeat the very purpose of a derivative work. Here, Defendants wanted a screenplay based on their manuscript. It seems unlikely that in converting the medium of their story from manuscript to screenplay, Defendants intended for Plaintiffs to alter the "focus and theme" of their work. Had Plaintiffs made such wholesale changes, it seems unlikely that Defendants would have been satisfied with Plaintiffs' work because changing the focus and theme of their work would thwart the very purpose of the screenplay.

28

Second, as set forth in greater detail below regarding Defendants' motion for summary judgment, Blakesley's standard is not the one applied under the Copyright Act.  In their brief in support of their motion for summary judgment, Defendants cite *Schrock v. Learning Curve International, Inc.*, 586 F.3d 513, 520 (7th Cir. 2009), for the proposition that "[t]he key inquiry [in determining the extent of copyright in a derivative work] is whether there is sufficient nontrivial expressive variation in the derivative work to make it distinguishable from the underlying work in some meaningful way."  However, in their brief in opposition to Plaintiffs' motion to exclude Blakesley's testimony, Defendants offer no explanation as to why Blakesley applied his own standard rather than *Schrock*'s.

An example of Blakesley's failure to apply the legal standard is his statement that "[r]earranging a sequence does not create new or original material; it simply presents the same material in a new order and thus does not represent an original or significant transformation from the source."  But the Copyright Act includes within its definition of a derivative work an "abridgement, condensation, or other form in which a work may be recast, transformed, or adapted."  17 U.S.C. § 101.  Thus, Blakesley's assertion that

the selection and rearrangement of material does not satisfy the originality

standard is contrary to the well-established principle of copyright law that

"[t]he selection and arrangement of preexisting material . . . is entitled to

copyright protection." *Penelope v. Brown*, 792 F. Supp. 132, 135 (D. Mass.

1992) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361

(1991); *see also Weissman v. Freeman*, 868 F.2d 1313, 1322 (2d Cir. 1989)

(copyright law "expressly protects the selection of subject matter and

content from underlying works, as well as the rearrangement of preexisting

material taken from those works"). Thus, because Blakesley's methods are

inconsistent with established principles of copyright law, they are

unreliable.

### 3.   The Relevance of Blakesley's Opinion

Naturally, the result of an unqualified expert using unreliable

methods is an irrelevant opinion. Blakesley's proffered testimony is

irrelevant for two reasons. First, it reaches a conclusion regarding an issue

that is not in dispute. Second, it addresses a pure issue of law and therefore

will not assist the jury.

In Defendants' motion for summary judgment, they argue that

Blakesley concluded that "Plaintiffs did not add any significant or original

material in preparing the screenplay and are not entitled to any copyright interest in the Screenplay, as a derivative work."  However, that is not what Blakesley concluded.  Instead, he opined that Plaintiffs' additions are "not sufficiently transformative to qualify the screenplay as an original work of art, and thus, it is . . . subject to the usual laws of copyrights governing derivative works."  Blakesley's actual conclusion—that the screenplay is not copyrightable as an original work—is irrelevant because Plaintiffs have not sought to protect the screenplay as an original work.  Both sides agree that the screenplay is not protectable as an original work but only as a derivative work.  And Plaintiffs have claimed a copyright only in the screenplay as a derivative work.  Accordingly, Blakesley's testimony that the screenplay is not protectable as an original work has no bearing on the copyrightability of the screenplay as a derivative work.

Moreover, Blakesley's testimony is inadmissible because it addresses a pure issue of law and therefore is not helpful to the jury.  Expert testimony is admissible where the expert's "specialized knowledge will help the *trier of fact* to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a) (emphasis added).  Thus, expert testimony regarding a pure legal issue is not relevant to the fact-finder.  *See Plantation Pipeline*

*Co. v. Cont'l Cas. Co.*, 1:08-cv-2811-WBH, 2008 WL 4737163, at *7 (N.D. Ga. July 31, 2008) ("Expert legal opinion is not admissible under Federal Rule of Evidence 702."); *see also United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts.").

Defendants gave Blakesley the task of determining whether the screenplay is copyrightable.  However, whether material is copyrightable is purely a legal issue.  *See Stern v. Does*, No. 09-1986DMG, 2011 WL 997230, at *2 (C.D. Cal. Feb. 10, 2011) ("When a defendant challenges the quantum of plaintiff's originality or creativity as a matter of law, these matters should be resolved solely by the judge."); *see also Schrock*, 586 F.3d at 517; *Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 34 n.5 (1st Cir. 2001); *Leigh v. Warner Bros., Inc.*, 10 F. Supp. 2d 1371, 1375 (S.D. Ga. 1998), *rev'd on other grounds*, *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1214 (11th Cir. 2000)); *Pivot Point Int'l, Inc. v. Charlene Prods., Inc.*, 932 F. Supp. 220, 225 (N.D. Ill. 1996).  Consequently, had Blakesley actually opined as to the copyrightability of the screenplay as a derivative work, his testimony as to this legal issue would be irrelevant and unhelpful to the trier of fact.

For all of these reasons, even if Defendants' disclosure of Blakesley had been timely, the Court would grant Plaintiffs' motion to exclude his testimony.

### III.    Defendants' Motion for Summary Judgment

Plaintiffs have asserted claims for (1) a declaratory judgment that (a) they own a valid and enforceable copyright in the screenplay, (b) the screenplay does not infringe any copyright owned by Defendants, and (c) Plaintiffs are entitled to market and produce a film version of the screenplay without any interference from Defendants; (2) breach of fiduciary duty; (3) breach of contract; (4) attorneys' fees and expenses; (5) punitive damages; (6) quantum meruit; and (7) specific performance. Defendants contend that summary judgment is proper as to all of Plaintiffs' claims.

Because the disposition of Plaintiffs' claims for breach of fiduciary duty and breach of contract necessarily affect their claim for declaratory judgment, the Court will analyze those claims first.

### A.   Legal Standard

Summary judgment is proper when no genuine dispute as to any material fact is present, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  The movant carries the initial burden and must show that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

The nonmovant is then required to "go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.  "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Resolving all doubts in favor of the nonmoving party, the Court must determine "whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.*

B.    Analysis

1.    Breach of Fiduciary Duty

Plaintiffs contend that the agreement reflects the parties' intent to form a partnership for the purpose of creating a film.  The creation of the screenplay, Plaintiffs argue, was only one part of the overall goal of producing a film from Defendants' manuscript.  Plaintiffs further argue that as partners, Defendants owed Plaintiffs fiduciary duties as well as a duty of confidence, loyalty and fair dealing.  According to Plaintiffs, Defendants breached those duties by inexplicably ceasing communication with Plaintiffs, feigning dissatisfaction of the screenplay to avoid their contractual obligations, and refusing to work with Plaintiffs to produce the screenplay into a film.

Defendants, on the other hand, contend that they hired Plaintiffs to write the screenplay, and that the agreement reflects that intention. According to Defendants, Plaintiffs' obligation was to write a screenplay to Defendants' satisfaction and in return Defendants would act as editors and pay Plaintiffs $8,000.  Although the agreement provided that the parties would "own the script in full partnership" and would be "active partners," Defendants argue that absent details as to how the parties would accept the

rights and responsibilities associated with a partnership, such nomenclature did not create a partnership.  Thus, it is Defendants' argument that because no partnership existed as a matter of law, Defendants did not breach any duty to Plaintiffs.

### a.    Partnership Formation

The Court first turns to whether the parties formed a partnership. O.C.G.A. § 14-8-6 provides in relevant part: "A partnership is an association of two or more persons to carry on as co-owners of a business for profit."  A partnership results from a contract, which may be either express or implied.  *Clark v. Schwartz*, 436 S.E.2d 759, 760 (Ga. Ct. App. 1993).  The question is whether the parties intended to form a partnership.  *Ghee v. Kimsey*, 346 S.E.2d 888, 889 (Ga. Ct. App. 1986).

First, Defendants argue that the parties did not form a partnership because they did not detail each party's rights and responsibilities in the contract.  Relying on *Jerry Dickerson Presents, Inc. v. Concert/Southern Chastain Promotions*, 579 S.E.2d 761 (Ga. Ct. App. 2003), Defendants contend that the parties' mere use of the word "partner," absent any documentation that the parties assumed the rights and responsibilities associated with a legal partnership, is not sufficient to create a partnership.

36

Defendants' reliance on *Dickerson* is misplaced.  In *Dickerson*, the plaintiff claimed that he and the defendants had formed a partnership.  In support of his claim, he submitted three letters referring to himself as a "joint venture partner" or "minority partner."  However, none of the three letters was written by the defendants, and the parties' only contract—a sublease—did not include the word "partner."  To determine whether a partnership nonetheless existed, the court looked to factors indicating the existence of a partnership, including "a common enterprise, the sharing of risk, the sharing of expenses, the sharing of profits and losses, a joint right of control over the business, and a joint ownership of capital."  *Id.* at 768 (citing *Aarons Rents, Inc. v. Fourteenth Street Venture*, 533 S.E.2d 759, 761 (Ga. Ct. App. 2000)).  Thus, in *Dickerson*, the court sought to ascertain whether, in absence of specific language asserting the existence of a partnership, a partnership could be inferred from the relevant contract and other evidence.

While Georgia courts apply the partnership factors in cases like *Dickerson* where there is no express agreement to form a partnership, the Georgia Supreme Court has made clear that "there is no need for inference when the parties have themselves entered into an express contract."

*Huggins v. Huggins*, 43 S.E. 759, 760 (Ga. 1903).  Thus, where parties "distinctly agree among themselves to become partners, there is no reason why the law should not take them at their word, even though that agreement falls short of the facts from which the law would otherwise have inferred a partnership."  *Accolades Apartments, L.P. v. Fulton Cnty.*, 612 S.E.2d 284, 286 (Ga. 2005) (citing *Huggins*, 43 S.E. at 760).  Where there is an express agreement to become partners, "there need not necessarily be anything said about joint ownership of property or profits, or joint liability for losses."  *Huggins*, 43 S.E. at 760.  And O.C.G.A. § 14-8-7, which deals with partnership formation in the absence of an express agreement, should not be applied when there is an express agreement to become partners. *Accolades Apartments,* 612 S.E.2d at 286.

Thus, the issue is whether the contract constitutes an express agreement to form a partnership.  To determine whether there is an express partnership, the court must analyze whether the parties intended to create a partnership.  *Aaron Rents*, 533 S.E.2d at 761.  "The language which the parties used in making the contract is to be looked to in determining what their intention was, which when ascertained will prevail over all other considerations."  *Chalkey v. Ward*, 166 S.E.2d 748, 753 (Ga. Ct. App. 1969).

Plaintiffs contend that the parties' use of the words "full partnership" and "active partners" evidences their express intent to form a partnership. Defendants, on the other hand, argue that the words "partnership" and "partner" are merely used in a "figurative sense."  Defendants also contend that the evidence shows Defendants never discussed or intended to form a partnership with Plaintiffs and the parties never discussed any partnership terms such as how revenues and expenses would be shared.

In *Antoskow & Associates, LLC v. Gregory*, 629 S.E.2d 1 (Ga. Ct. App. 2005), the court examined a contract clause similar to one at issue here—that the parties would own the script in "full partnership."  There, a boyfriend executed the following agreement with his girlfriend:

> On this day, January 18, 2000, I, Christopher P. Antoskow, will state the following: If I, Christopher P. Antoskow, dies [sic] with out [sic] Carolyn M. Gregory, and we are still together, she will receive 30% of the Jessica-Morgan Building . . . .  If Christopher P. Antoskow and Carolyn M. Gregory are not together at that time she will receive 20%.  In any case in incident, Carolyn M. Gregory [will receive] a percentage as a *partner in ownership* of this property.  On the sale of said property, Carolyn Gregory, will receive the said above percentage of whatever the total sale may be at the time of the sale of the property.  This was agreed upon by both parties involved in this legal document.

629 S.E.2d at 3 (emphasis added). The court found that the document unambiguously stated that the girlfriend was a partner in ownership of the subject property, thereby evidencing a partnership.

As in *Gregory*, where the court found an express partnership based on the express language of the parties' written agreement, the Court finds that the contract's provision that the parties would own the screenplay in full partnership evidences the parties' intent to become partners in ownership of the screenplay. Further, the agreement's provision that the parties be "active partners" likewise indicates a partnership for "creation" of a screenplay.[14] Because the agreement unambiguously expresses the parties' intent to form a partnership, the Court need not consider

---

[14] Plaintiffs also argue that even if the parties did not expressly agree to be partners, at a minimum the agreement shows an implied partnership. As set forth above, "[f]actors that indicate the existence of a partnership include a common enterprise, the sharing of risk, the sharing of expenses, the sharing of profits and losses, a joint right of control over the business, and a joint ownership of capital." *Aaron Rents*, 533 S.E.2d at 761.

Several of these factors weigh against finding a partnership. As Defendants point out, the parties did not specifically define how profits and losses would be shared. Further, the fact that Plaintiffs were required to write the screenplay to Defendants' satisfaction indicates a lack of a joint right of control over the business.

However, other factors support the existence of a partnership. First, the agreement provides for a "joint undertaking, a union of labor or a union of capital and labor." *Huggins*, 43 S.E. at 760. According to the contract, Defendants were to invest money, reimburse Plaintiffs, and contribute their labor in acting as editors. Plaintiffs were to contribute their labor of writing the screenplay and submitting a production budget. Second, the agreement reflects a common enterprise to create a screenplay. Thus, a partnership could also be implied from the contract. However, as with the express partnership, such a partnership would be limited to the creation of the screenplay.

Defendants' parol evidence that the parties never discussed a partnership or that Defendants did not intend to form a partnership.  O.C.G.A. § 24-6-1 ("Parol contemporaneous evidence is generally inadmissible to contradict or vary the terms of a valid written instrument.").

In concluding that the partnership was to create and own the screenplay, the Court rejects Plaintiffs' argument that the partnership was also to produce the screenplay into a movie.  At first blush, Plaintiffs' argument is rather persuasive.  After all, within the agreement are terms related to movie-making.  Specifically, the contract includes the terms "first talent, creative or development attachment."  Plaintiffs explain that "talent attachment" means hiring actors, "creative attachment" means hiring a director," and "development attachment" means hiring co-producers.  Plaintiffs argue that the inclusion of these terms shows that the parties were to perform these "tasks," i.e., hire talent and a director and sign co-producers, once Defendants approved the screenplay.  Additionally, the contract requires Plaintiffs to submit a "producers top-sheet production budget," which Plaintiffs explain is a one-page overview of the budget to make a film.  Plaintiffs argue that if the contract is construed not to include an agreement to act in partnership to produce the screenplay into a film,

the terms related to making a movie are rendered meaningless, thus

violating Georgia's rules of contract construction.

First, to determine the parties' partnership duties the Court looks to

the partnership agreement. *See Oddo v. Ries*, 743 F.2d 630, 632 (9th Cir.

1984) (looking to partnership agreement to define parties' duties pursuant

to partnership to create and publish a book describing how to restore F-100

pickup trucks).  Contrary to Plaintiffs' assertion that the hiring of lead

actors, hiring of a director, and the signing of co-producers were "tasks"

that the parties were to perform once Defendants approved the screenplay,

the agreement is bereft of any language indicating that Plaintiffs and/or

Defendants were to perform such tasks.  The agreement specifically

itemizes the parties' partnership duties according to those that (1) Plaintiffs

agreed to perform, (2) Defendants agreed to perform, and (3) both parties

agreed to perform.  None of those three lists includes tasks related to the

hiring of lead actors, hiring of a director, or the signing of co-producers.

While the contract does contain a requirement that Plaintiffs submit a

production budget, the contract contains no provision requiring

Defendants to accept Plaintiffs' budget or to do anything further with it—

such as use it to produce the screenplay into a film—once Plaintiffs submitted it.

Second, although the Court does not construe the terms "talent, creative or development attachment" as creating an agreement to produce a film from the screenplay, the terms are not rendered meaningless.  Because they appear in the section of the contract setting forth the period of performance, these terms are necessary for determining the contract's expiration.  According to the contract's language, the parties' obligations pursuant to the agreement would terminate upon occurrence of "satisfaction of [Defendants], and/or date of first talent, creative or development attachment."  Thus, as the contract plainly states, these potential events were relevant to the period of performance.  Simply including these events as instances that would result in the contract's termination did not necessarily mean the events *would* occur, or that the parties were required to perform any specific tasks related to them—only that in the event of their occurrence, the parties were no longer required to perform under the contract.  As to the requirement that Plaintiffs submit a production budget, this simply shows that the parties were considering

producing a movie from the screenplay.  It does not, however, show that they ever actually agreed to do so.

Third, were the Court to construe the inclusion of terms related to making a movie as being an agreement to produce the screenplay into a film, it would create a construction that is contrary to the contract's express terms.[15]  The contract expressly provides that it is "for the creation of a long form feature film script" based on Defendants' manuscript and makes no mention of producing the screenplay into a film.  Plaintiffs argue that there is correspondence, both before and after the parties signed the agreement, demonstrating the parties' intent to make a film.  However, the Court only looks to the parties' intent as expressed by the contract.  Although the parties discussed making a movie, "[i]t is the duty of the courts to construe and enforce contracts as made, and not to make them for the parties.  The law will not make a contract for the parties which is different from the contract which was executed by them."  *Sellers v. Alco Fin., Inc.*, 204 S.E.2d 478, 480 (Ga. Ct. App. 1974).  While Richards recognized early on that Plaintiffs "would need to contract the 'rights' to shop this project, and yes it

---

[15] Notably, Plaintiffs point to no evidence other than the contract in arguing that there is a partnership to produce a movie.  Thus, because there is a contract and Plaintiffs point to no evidence outside the contract, the Court need not consider whether other evidence implies a partnership to produce the screenplay into a movie.

needs to be exclusive," and Plaintiffs might have even intended to contract

to produce a movie based on the screenplay, the contract itself simply does

not reflect an agreement to produce the screenplay into a film.  Thus, as a

matter of law, the Court cannot hold that the contract was for the

production of the screenplay into a movie when it unambiguously states

that it was for the screenplay's creation.

### b. Whether Defendants Breached a Fiduciary Duty to Plaintiffs

Having concluded that the parties were partners for the purposes of

creating and owning the screenplay, the Court turns to the issue of whether

Plaintiffs can show a breach of fiduciary duty by Defendants.

A claim for breach of fiduciary duty requires proof of three elements:

(1) the existence of a fiduciary duty, (2) breach of that duty, and (3)

damages proximately caused by the breach.  *Bailey v. Stonecrest Condo.*

*Ass'n, Inc.*, 696 S.E.2d 462, 470 (Ga. Ct. App. 2010).  Fiduciary

relationships are synonymous with "confidential relationships," as

described in O.C.G.A. § 23-2-58.  *Arko v. Cirou*, 700 S.E.2d 604, 608 (Ga.

Ct. App. 2010).  Pursuant to that statute, a relationship is confidential

"where one party is so situated as to exercise a controlling influence over

the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc." O.C.G.A. § 23-2-58.

Plaintiffs aver that Defendants breached their fiduciary duty by inexplicably ceasing communication with Plaintiffs regarding the screenplay and informing Plaintiffs that the screenplay was unsatisfactory and unmarketable, despite previously having stated that they were extremely satisfied with the screenplay.  Even assuming that ceasing to communicate with Plaintiffs and feigning dissatisfaction with their screenplay constitutes a breach of fiduciary duty, Plaintiffs' claim fails as a matter of law.

Plaintiffs' evidence is that Defendants terminated communications in March 2010 and that they rejected the screenplay as unmarketable in April 2010.  But none of these actions related to the creation of the screenplay, which, as explained above, was the purpose of the partnership.  As of January 2010, the screenplay had been created.  After that point, Plaintiffs efforts and communications related to the production of the screenplay into a movie—not its creation.  Plaintiffs' own evidence is that they were

attending meetings and putting together the private placement memorandum to raise money for the film.  And in a letter to Defendants' counsel, Plaintiffs' counsel stated, "[Plaintiffs] have attempted to contact and communicate with [Defendants] regarding the execution of a Production Agreement, which is the next step in the production of the screenplay into a motion picture."  Thus, what Defendants had stopped communicating with Plaintiffs about in March 2010 was *production* of the screenplay, not its creation.

Along the same lines, Defendants' rejection of the screenplay as unsatisfactory and unmarketable related to Defendants' decision not to produce the screenplay into a film.  Nevertheless, Plaintiffs argue that Defendants were feigning dissatisfaction with the screenplay, which is not permissible when a contract contains a satisfaction clause.  While this legal principle is correct, it is irrelevant because even if Defendants truly found the screenplay satisfactory and were only feigning dissatisfaction, under the contract Defendants had no duty to do anything further with it, i.e., they had no obligation to work with Plaintiffs to produce the screenplay into a movie.

Finally, Plaintiffs' third basis for breach of fiduciary duty—that Defendants' failed to act with Plaintiffs in producing the screenplay into a film—obviously fails in light of the Court's holding that the parties never formed a partnership to produce the screenplay into a movie.

Accordingly, Defendants' motion for summary judgment will be granted as to Plaintiffs' claim for breach of fiduciary duty.

### 2.   Breach of Contract

Like their claim for breach of fiduciary duty, Plaintiffs' claim for breach of contract fails as a matter of law.  The contract specifically sets forth Defendants' duties under the agreement.  Defendants were to reimburse Plaintiffs up to $8,000 for writing the screenplay and serve as editors during the first draft phase.  Rather than averring that Defendants breached either of these express duties, Plaintiffs aver that Defendants breached their contractual agreement to act as partners in the development of the screenplay and its production into a film and that Defendants breached the duty of good faith and fair dealing by failing and refusing to exercise reasonable efforts to develop the screenplay with Plaintiffs.

The contract only required Defendants to create the screenplay with Plaintiffs by reimbursing Plaintiffs up to $8,000 and acting as editors.  As

of January 2010, the screenplay was created and Defendants had fulfilled their contractual duties.  As already explained, Plaintiffs have not shown that Defendants had any further duty under the contract to develop the screenplay or act as partners in developing the screenplay into a film. Because Defendants fulfilled their contractual duties, as a matter of law, Plaintiffs cannot show that Defendants breached the contract.

The Court will therefore grant Defendants summary judgment on Plaintiffs' claim for breach of contract.

### 3.    Declaratory Judgment

Plaintiffs seek a declaratory judgment regarding their alleged copyright in the screenplay.  Their requested declaratory relief has three parts.  They seek declarations that (1) they own a valid and enforceable copyright in the screenplay, (2) the screenplay does not infringe any copyright owned by Defendants, and (3) they are entitled to market and produce a film version of the screenplay without any interference from Defendants.

Defendants contend that Plaintiffs do not have a copyright ownership in the screenplay.  They argue that because all of the material in the screenplay was taken from the manuscript, Plaintiffs have contributed no

49

original material to the screenplay and thus Plaintiffs' registration of the screenplay's copyright was fraudulent.  Further, Defendants urge the Court to order Plaintiffs' copyright registration of the screenplay be cancelled.

As an initial matter, whether Plaintiffs' registration should be cancelled is not before the Court because Defendants did not counterclaim for cancellation of Plaintiffs' registration.  The only issues the Court considers for purposes of this motion are whether there is a genuine dispute of material fact as to Plaintiffs' claim for a declaratory judgment that they have a valid copyright in the screenplay, their copyright does not infringe Defendants' copyright in the manuscript, and they are entitled to market and produce a film version of the screenplay.  With this in mind, the Court turns to Plaintiffs' claim.

### a.   Whether Plaintiffs Own a Copyright in the Screenplay

The Court first considers whether Plaintiffs have shown that they own a valid copyright in the screenplay.  As explained above regarding Plaintiffs' motion to exclude Blakesley's testimony, copyrightability is a purely legal issue. *See Stern*, 2011 WL 99730, at*2 ("When a defendant challenges the quantum of plaintiff's originality or creativity as a matter of law, these

matters should be resolved solely by the judge.").  After carefully considering Plaintiffs' evidence, the Court finds that the screenplay is copyrightable as a derivative work and that it is co-owned by Plaintiffs and Defendants.

Under the Copyright Act, "[a] work consisting of editorial revisions, annotations, elaborations, or other modifications [to a preexisting work which], as a whole, represent an original work of authorship, is a 'derivative work.'"  17 U.S.C. § 101.  The parties do not dispute that the screenplay is a derivative work.  However, Defendants contend that the screenplay is not copyrightable.[16]  To qualify for a copyright separate from the underlying work, the derivative work must (1) not unlawfully use the preexisting material (the underlying material upon which the derivative work is based) and (2) be sufficiently original.  *Montgomery v. Noga,* 168 F.3d 1282, 1290 (11th Cir. 1999) (citing 17 U.S.C. § 103 (1994); *Stewart v. Abend,* 495 U.S.

---

[16] At least the Court thinks this is what Defendants have argued.  Their argument is actually unclear.  They argue that Plaintiffs do not have a copyright in the screenplay because Plaintiffs cannot show that the screenplay is original.  This argument seems to indicate that because it lacks originality, the screenplay is not separately copyrightable from the manuscript.  However, Defendants also argue that because "100% of the material in the screenplay was taken from the manuscript," Defendants "are in fact the true authors of the screenplay."  Contrary to their argument that the screenplay lacks originality, this statement seems to indicate that Defendants believe the screenplay is in fact separately copyrightable, which means that it is original.  The Court will first determine whether the screenplay is a copyrightable derivative work.

207, 223-24 (1990); 1 NIMMER ON COPYRIGHT §§ 3.01, 3.04 [A])).  Here,

Defendants contend that the screenplay is not sufficiently original to

warrant protection under the Act.[17]

     "With regard to the requirement of originality, all that must be shown

is that the work 'possesses at least some minimal degree of creativity' . . . .

To be sure, the requisite level of creativity is extremely low; even a slight

amount will suffice."  *Id.* (quoting *Feist*, 499 U.S. at 345).  "The relevant

standard is whether a derivative work contains a nontrivial variation from

the preexisting work sufficient to render the derivative work

distinguishable from the prior work in any meaningful manner."  *Schrock*,

586 F.3d at 518 (quoting 1 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT

§ 3.03[A], at 3-10 (2009)).

     Defendants argue that Plaintiffs do not meet the originality standard

because Plaintiffs have not shown that they "added" any new material to the

screenplay.  Defendants are wrong for two reasons.

     First, "originality" does not hinge merely upon literal additions.  In

fixating upon the word "additions," Defendants read the Copyright Act too

---

[17] Defendants have not argued that Plaintiffs unlawfully used the material in the manuscript to create the screenplay, and the agreement clearly contemplates that Plaintiffs would use the manuscript to write the screenplay.

narrowly.  Under the Act, the copyright in a "derivative work extends only to the material contributed by the author of such work . . . ."  17 U.S.C. § 103(b).  Defendants interpret this language to mean that a derivative-work author may claim a copyright only in the literal additions the derivative-work author made to the underlying work.  But a derivative work is not so limited.  The Copyright Act defines a derivative work as one

> based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, *abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted.*

*Id.* § 101 (emphasis added).  Thus, whether Plaintiffs' efforts in creating the screenplay are sufficiently original is not simply a question of whether Plaintiffs made literal "additions" to the manuscript, i.e., whether they added new characters, scenes, plots, or dialogue.[18]  Plaintiffs' contributions include the creative judgments they made to remove or condense the original material—not just the materials they added.  *See Penelope*, 792 F. Supp. at 135 ("The selection and arrangement of preexisting material . . . is entitled to copyright protection."); *Weissman*, 868 F.2d at 1322 (copyright

---

[18] Notably, if only literal additions were copyrightable, as Defendants argue, then collective works would not be copyrightable at all.  As explained by Nimmer, "A collective work will qualify for copyright by reason of the original effort expended in the process of compilation, even if no new matter is added."  1 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT § 3.03 (2012).

law "expressly protects the selection of subject matter and content from underlying works, as well as the rearrangement of preexisting material taken from those works").

Second, despite Defendants' insistence throughout this litigation that Plaintiffs have refused to identify what original material they added to the screenplay, Plaintiffs have repeatedly offered evidence of their contributions—including additions as well as condensations and deletions— to the manuscript in creating the screenplay.  First, Plaintiffs submitted to Defendants the redline[19] that compares the manuscript and the screenplay.  Second, Plaintiffs identified in an interrogatory response their alleged contributions.[20]  Third, Plaintiffs described their contributions in their

---

[19] To create the redline version, a lawyer in Plaintiffs' counsel's firm used tracking software that compared the manuscript and screenplay and then showed any changes that were made to the manuscript in producing the screenplay.  Defendants' counsel has repeatedly argued that this evidence is inadmissible because Plaintiffs themselves did not create it.  However, the creator of this version has authenticated it and testified to its accuracy, so it is admissible.

Defendants' counsel's insistence that Plaintiffs' redline should not be admissible is puzzling considering that Defendants' proffered expert, Blakesley, did the exact same thing as Plaintiffs—created a redlined version with tracking software—in order to determine how the screenplay is different from the manuscript.  However, unlike Defendants, Plaintiffs have offered the redline version so that the Court can make its own conclusions of law regarding those changes rather than having an English professor, who is an expert in plagiarism but not copyright law, opine as to the legal significance of the differences between the manuscript and screenplay.

[20] Although in passing the Court referred to the redline as a "magnum opus," that term is not necessarily derogatory as Defendants repeatedly insinuate.  In fact, the redline is the best tool for highlighting the differences between the manuscript and

depositions.  And on pages thirteen and fourteen of Plaintiffs' brief in

opposition to Defendants' motion, Plaintiffs list some non-exhaustive

examples of their contributions:

- Plaintiffs added to or changed the description of many scenes and events, including: (1) changing many elements of the opening scene; (2) changing Zack's introduction at the talent show; (3) adding to the repeated use of the number thirteen in the flashback where Candy met Ronnie Thornbush; (4) adding the many electronic collars on the dog that go haywire; (5) changing the scene where Gracie sees Nookie on Mexican television; (6) adding the recurring depiction of Ronnie Jr. imitating a pit bull; (7) moving the location of Candy Rivers' trailer park; (8) adding the final shot of Belle's tattoo; and (9) changing the bonfire scene (for example by adding Belle throwing Ronnie's cremated penis into the bonfire).
- Plaintiffs added two scenes foreshadowing Rex Taylor's return to town.
- Plaintiffs added dialogue throughout the screenplay.
- Plaintiffs added many visual devices, such as the use of split screens, flashbacks, and montages.
- Plaintiffs not only carefully chose what portions of the manuscript to include and what portions to remove, but when they cut material they had to splice together the remainder.

Although the Court has not included them, Plaintiffs provided specific

citations to record evidence in support of each example above.

---

screenplay.  While reading the entire redline would no doubt prove time-consuming, in their supplemental interrogatory response and their brief in opposition to Defendants' motion for summary judgment, Plaintiffs graciously spared Defendants and the Court that task by citing specific page numbers where they made changes to the manuscript to create the screenplay.

After reviewing Plaintiffs' examples as well as the redline Plaintiffs produced, it is clear that contrary to Defendants' contention, Plaintiffs have produced evidence that they made sufficient transformations to the manuscript to satisfy the originality standard.[21]  "One who slavishly or mechanically copie[s] from others may not claim to be an author."  *Sherry Mfg. Co. v. Towel King of Fla., Inc.*, 753 F.2d 1565, 1568 (11th Cir. 1985) (citing 1 M. NIMMER, NIMMER ON COPYRIGHT § 1.06[A], at 1-37 (1984)). However, that is not what Plaintiffs have done.  Admittedly, some of Plaintiffs' changes, such as the "elimination and addition of punctuation, changes of spelling of certain words, elimination and addition of quotation marks, and correction of typographical errors," do not meet the originality standard.  *Grove Press, Inc. v. Collectors Publ'n, Inc.*, 264 F. Supp. 603, 605 (C.D. Cal. 1967).  But others do.

First, despite Defendants' repeated assertion that Plaintiffs did not add anything to the screenplay, Defendants actually admitted that Plaintiffs did make additions: in an email, Defendants told Plaintiffs, "You guys are

---

[21] Defendants also repeatedly contend that "Plaintiffs admit that 100% of the material in the screenplay was taken from the manuscript."  Plaintiffs have admitted no such thing.  As Plaintiffs argue, "While Durkin acknowledged that the *initial step* of the adaptation process involved taking 100% of the manuscript, he was referring to only the very first step.  All his testimony stands for is the unremarkable proposition that a derivative work begins initially with the underlying work."

awesome!  Love the funny stuff you *added*!" (Emphasis added.)  Second, as Plaintiffs contend, Plaintiffs have added dialogue, visual devices, and scene descriptions throughout the screenplay.  Third, even a cursory review of the screenplay shows that Plaintiffs deleted a large amount of material from the manuscript to make the screenplay.  Deciding what material—such as dialogue and scenes—to keep versus what to delete is undoubtedly a creative decision.  Taken together, these additions, revisions, and deletions transform the screenplay such that it is "distinguishable" from the manuscript in a "meaningful manner."  *Schrock*, 586 F.3d at 520.

Having concluded that the screenplay is copyrightable, the Court next determines who owns the copyright in the screenplay.  To do so, the Court looks no further than the contract, which expressly provides that Plaintiffs and Defendants own the screenplay in "full partnership."

Nevertheless, Defendants advance several arguments for why Plaintiffs do not own a copyright in the screenplay.  First, they argue that the contract only transferred copyright to the physical screenplay.  Defendants read the contract provision that the parties own the screenplay in full partnership as merely "stat[ing], in figurative language . . . that the parties will jointly own the physical screenplay."

57

Defendants' proffered construction defies common sense.  It is true that "[o]wnership of a copyright . . . is distinct from ownership of any material object in which the work is embodied," and "[t]ransfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object."  17 U.S.C. § 202.  For example, in *Viacom International, Inc. v. Fanzine International, Inc.*, No. 98civ.7448(KMW), 2000 WL 1854903, at *4 (S.D.N.Y. July 12, 2000), the court explained that plaintiff's providing defendant with slides depicting cartoon characters, which were copyrighted by plaintiff, did not give defendant permission to copy the images of the characters.  Likewise, when a person purchases a book, he does not gain a copyright interest to the material in the novel; he simply owns the book.

The facts here are in no way similar to those in either of the above situations.  Here, Defendants expressly granted Plaintiffs co-ownership of "the script," not merely a physical copy of the screenplay.  Unlike an object whose value is derived from its tangible form and cannot easily be reproduced—such as a sculpture—the screenplay exists in electronic format and thus can be produced at will.  Thus, the screenplay's value does not

58

derive from its physical form and there would be no point in owning only a physical printed copy.  Therefore, the common sense meaning of the contract provision that the parties would "own the script in full partnership" is obviously that they would co-own the copyright in the screenplay in partnership.

Defendants next contend that because the agreement did not employ specific language denoting a transfer, i.e., the parties did not use the words "transfer," "grant" or "assign," no interest was conveyed.  Specifically, Defendants argue that the language does not reflect a transfer under 17 U.S.C. § 204(a), which provides that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  In response, Plaintiffs contend that no "magic language" is required to transfer a copyright.  *Thomsen v. Famous Dave's of Am., Inc.*, 606 F.3d 905, 908 (8th Cir. 2010).

As with any contract, the essence of the inquiry is whether the parties intended to transfer a copyright.  *Radio Television Espanola S.A. v. New World Entm't, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999) ("[T]he parties' intent

as evidenced by the writing must demonstrate a transfer of copyright.").
"Accordingly, even though a written instrument may lack the terms
'transfer' and 'copyright,' it still may suffice to evidence their mutual intent
to transfer the copyright interest." 3 M. NIMMER & D. NIMMER, NIMMER ON
COPYRIGHT § 10.03 (2012).  Here, the parties clearly intended to create the
screenplay together and co-own the copyright in the screenplay.  Thus,
Defendants' argument is without merit.

Defendants also argue that the contract did not grant any copyright
interest to Plaintiffs because copyrights can only be owned in joint tenancy,
not in "full partnership."  In response, Plaintiffs argue that *Oddo v. Ries*,
743 F.2d 630, 633 (9th Cir. 1984), makes clear that copyrights can be
owned in partnership.  There, the court explained, "[W]e see no reason why
partners should be excluded from the general rules governing copyright co-
ownership."  *Id.*  Defendants reply that they concede that a partnership can
own a copyright; their contention is that parties cannot own a copyright in
"full partnership," only as "joint tenants with an undivided interest in the
whole."  This argument is also meritless.

First, as explained above, the parties did form a partnership for the
purposes of creating and owning the screenplay.  Second, even if the parties

did not form a partnership, the agreement clearly indicates that Plaintiffs and Defendants would be joint owners of the screenplay.  The parties' intent is not defeated simply because they used the term "full partnership." Moreover, Defendants have cited no authority requiring the parties to use the term "joint tenants" in contracting for co-ownership of the screenplay. Thus, Plaintiffs' asserted interest does not fail simply because the contract used the term "full partnership."

Finally, Defendants insinuate that the screenplay constituted a work for hire.  They assert in passing that their counsel sent Plaintiffs a work-for-hire agreement because "[t]he sending of a work-for-hire agreement was simply normal practice and an acknowledgement of the true relationship between the parties."  To be clear, the screenplay is not a work for hire. Under the Copyright Act, a work is made for hire if it is either (1) prepared by an employee within the scope of his or her employment, or (2) prepared by an independent contractor and falls within one of the categories of specially ordered or commissioned works specified in the statute.  17 U.S.C. § 101.  To be considered a work for hire, the parties must expressly agree in writing that the work is made for hire.  *Id.*  Thus, because Plaintiffs were not Defendants' employees and there is no written agreement stating that

the screenplay is a work made for hire, the work-for-hire doctrine is inapplicable. *See Effects Assocs. v. Cohen*, 908 F.2d 555, 557 n.4 (9th Cir. 1990) (special effects footage was not work for hire where creator was not employee and there was no written work-for-hire agreement).

Accordingly, the Court finds that as a matter of law Plaintiffs are co-owners of the copyright in the screenplay.[22]  There is nothing ambiguous about the phrase that the parties would "own the screenplay in full partnership," and thus the Court must enforce the contract as written.  *See Gill v. B&R Int'l, Inc.*, 507 S.E.2d 477, 480 (Ga. Ct. App. 1998) ("[I]f no ambiguity appears, the trial court enforces the contract according to its terms . . . .").  The Court will therefore deny Defendants' motion for summary judgment.[23]  Moreover, unless Defendants can show cause as to why the Court should not enter judgment in favor of Plaintiffs on this portion of their declaratory-judgment claim, the Court will grant Plaintiffs a

---

[22] Based on this conclusion, Plaintiffs' copyright registration of the screenplay, which currently lists Plaintiffs as the screenplay's sole owners, should be amended to reflect that Plaintiffs and Defendants are co-owners of the screenplay.

[23] Despite Plaintiffs' argument that there is a genuine dispute of fact as to whether the contract transferred a copyright in the screenplay, based on the Court's finding that the contract is unambiguous, there is no dispute of fact for the jury to resolve on this claim.

declaratory judgment that Plaintiffs and Defendants are co-owners of the copyright in the screenplay.

> **b.** **Whether Plaintiffs' Copyright in the Screenplay Infringes Any Copyright Owned by Defendants**

Plaintiffs also seek a declaration that their copyright interest in the screenplay does not infringe "any copyright owned by [Defendants]."  While the Court will not go as far as holding that Plaintiffs' copyright does not infringe "any" copyright of Defendants, it is clear that, as a matter of law, the copyright in the screenplay, which is co-owned in partnership by Plaintiffs and Defendants, does not infringe Defendants' copyright in their manuscript.

As already set forth, to be copyrightable, a derivative work must not unlawfully use the preexisting material upon which it is based. *Montgomery,* 168 F.3d at 1290.  Here, the agreement expressly provides that Plaintiffs would use Defendants' manuscript to create a screenplay. Therefore, Defendants granted Plaintiffs a license for the purpose of creating the screenplay because without a license to use the manuscript, the purpose of the agreement and partnership—to create the screenplay— would be defeated.  Thus, Plaintiffs have a written license to use the

manuscript for the purpose of creating the screenplay.  The Court will therefore deny Defendants' motion for summary judgment as to this portion of Plaintiffs' declaratory-judgment claim.  Further, the Court will grant Plaintiffs a declaratory judgment that their copyright in the screenplay does not infringe Defendants' copyright in the manuscript, unless Defendants show cause as to why such a declaration should not be issued.

### c.   Whether Plaintiffs Have the Right to Market and Produce a Film Version of the Screenplay

Defendants argue that even if Plaintiffs are co-owners of the copyright in the screenplay, Plaintiffs do not have any right to make a "Snow White Ladies" movie without Defendants' permission.  They contend that the contract does not grant Plaintiffs any exclusive rights in the material from the manuscript.  In response, Plaintiffs assert that if the parties are co-owners of the screenplay, it is immaterial "who contributed or authored what."  Additionally, Plaintiffs assert that as co-owners of the screenplay they are free to make use of the screenplay, including the preexisting material taken from the manuscript, without any involvement from Defendants.  Plaintiffs are wrong.

Even though Plaintiffs own a copyright in the screenplay, that copyright is limited: the copyright in the derivative work "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material."  17 U.S.C. § 103.  Thus, Plaintiffs' copyright in the screenplay does not extend to any material in the screenplay that was taken from the manuscript; their copyright protects solely their contributions to the screenplay, and Defendants continue to own the copyright in the manuscript.

A movie based on the screenplay would also be a derivative work of the manuscript.  As a derivative work, a movie would necessarily infringe Defendants' copyright in their manuscript unless Defendants grant the makers of the movie permission to use the manuscript.  *See* 1 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT § 3.04 (2012); *Gilliam v. Am. Broad. Co., Inc.*, 538 F.2d 14 20 (9th Cir. 1976) ("One who obtains permission to use a copyrighted script in the production of a derivative work . . . may not exceed the specific purpose for which permission was granted," and "[s]ince the copyright in the underlying [work] survives intact despite the incorporation of that work into a derivative work, one who uses the

[underlying work], even with the permission of the proprietor of the derivative work, may infringe the underlying copyright."); *Russell v. Price*, 612 F.2d 1123, 1128 (9th Cir. 1979) (The established doctrine that a derivative-work author cannot create additional derivative works that incorporate the original work without the permission of the owner of the original work copyright "prevents unauthorized copying or other infringing use of the underlying work or any part of that work contained in the derivative product so long as the underlying work itself remains copyrighted.").

　　To determine whether Defendants have granted Plaintiffs permission to use the screenplay for future derivative works, such as a movie, the Court looks to the parties' contract. *See* 1 NIMMER, *supra*, § 3.04 ("The rights between the underlying copyright owner and derivative owner should be determined by the contract between them."). As Defendants argue, the contract contains no language granting Plaintiffs any copyright in the manuscript or granting Plaintiffs a license to use the underlying material from the manuscript to make a movie. The Court concludes, therefore, that as a matter of law Plaintiffs are not entitled to a declaratory judgment that

they have the right to use any materials from the screenplay that are from the underlying manuscript.

The two cases Plaintiffs cite in support of their contention to the contrary, *Bull Publishing Co. v. Sandoz Nutrition Corp.*, 13 U.S.P.Q.2d 1678 (N.D. Cal. 1989), and *Oddo*, 743 F.2d at 630, actually support the Court's holding.

In *Bull Publishing*, the plaintiff publishing company contracted with two authors to write a book on weight loss. The book was to be based on student manuals that the authors had already written. When completed, the book consisted of material taken verbatim from the manuals, revised portions of the manuals, and new original material. The plaintiff publisher sought to sue a defendant weight-loss company for infringement of the book. However, the materials from the book that Defendant had infringed were portions that were taken verbatim from the manuals. The court explained that because the authors, and not the publisher, owned the copyright in the manuals, the publisher could not sue for infringement of those materials unless it proved that it owned the copyright to the manuals. Because the publisher was able to present evidence that the authors had transferred the copyright in the manuals to it, the court found that the

publisher had standing to sue for infringement of materials from those manuals.

Plaintiffs cite *Bull Publishing* for the proposition that as owners of the copyright in the derivative work, they have the right to make use of the entire screenplay, without regard to what portion Plaintiffs contributed and what portion was taken from Defendants' manuscript. However, that is not what *Bull Publishing* holds. *Bull Publishing* simply illustrates the concept already explained above: the copyright in a derivative work extends only to the contributions made in creating the derivative work and in no way affects the copyright in the original work. Thus, *Bull Publishing* makes clear that in a derivative work, copyright ownership in the derivative work is split—the derivative-work author owns the copyright in any contributions he made, but the owner of the underlying work retains copyright ownership of any material from the underlying work. Therefore, contrary to Plaintiffs' assertion, "who contributed or authored what" is crucial to determining whether a party has infringed a derivative work. Here, unlike the publisher in *Bull Publishing* who owned the copyright in the underlying student manuals, Plaintiffs have presented no evidence that they own the copyright to the manuscript. Plaintiffs' copyright is thus limited to their

contributions in the screenplay, and in the absence of a showing that they own a copyright in the manuscript or a license to use the manuscript to make additional derivative works, they may not produce a movie based on the manuscript without infringing Defendants' copyright in the manuscript.

*Oddo*, which Plaintiffs cite in support of their contention that they are free to "make use of the screenplay as Plaintiffs see fit," is even more instructive in showing why Plaintiffs may not make a film based on the screenplay without Defendants' permission.  In *Oddo*, 743 F.2d at 630, the parties formed a partnership for the purpose of writing a book on restoring Ford F-100 pickup trucks.  The plaintiff had previously published magazine articles on the topic and reworked the articles to create a manuscript. However, the defendant became unhappy with plaintiff's progress and decided to hire another writer to complete the manuscript.  The defendant then published the completed manuscript as a book.  The book consisted largely of plaintiff's manuscript, with some new material added by the other writer.  The plaintiff sued the defendant for copyright infringement.

The court first explained that the defendant did not infringe the plaintiff's copyright in the book or manuscript.  The parties' partnership owned the book and manuscript, and because a co-owner of a copyright

cannot sue his co-owner for infringement, the plaintiff could not sue the defendant for infringement of the book or manuscript.  *Id.* at 633 (citing *Richmond v. Weiner,* 353 F.2d 41, 46 (9th Cir. 1965); *Picture Music Inc. v. Bourne, Inc.,* 314 F. Supp. 640, 646 (S.D.N.Y. 1970)).  The court went on to explain that each co-owner has an independent right to use or license the copyright, but must account to his co-owners for any profits he earns from licensing or use of the copyright.  Based on this language, Plaintiffs contend that they have the right to use or license the use of the copyright in the screenplay, provided they account to Defendants for any profits earned.  However, this part of the *Oddo* opinion merely demonstrates that as co-owners of the screenplay, Plaintiffs would not infringe Defendants' copyright *in the screenplay* by making a movie based on the screenplay.[24]

Plaintiffs, however, ignore the second part of the *Oddo* court's opinion, which is directly on point as to whether Plaintiffs will infringe Defendants' copyright *in the manuscript* by producing a film based on the screenplay.  After finding no infringement in the book or manuscript, the *Oddo* court went on to analyze whether the defendant had infringed the

---

[24] Likewise, Defendants would not infringe Plaintiffs' copyright in the screenplay should Defendants use the screenplay to produce a film.  Defendants must, however, account to Plaintiffs for any profits they realize from the use or license of the screenplay.

plaintiff's copyright in the articles by using portions of the articles in the manuscript and book.  First, the court held that the defendant had not infringed plaintiff's copyright by using material from the articles in the manuscript.  The court reasoned that by writing a manuscript based on the articles, the plaintiff gave the partnership permission, via an implied license, to use the articles in the manuscript.  "However, the implied license to use the articles in the manuscript [did] not give [the defendant] or the partnership the right to use the articles in any work other than the manuscript itself."  *Id.* at 634.  The defendant, therefore, infringed the plaintiff's copyright in the articles by publishing the book.

Here, Defendants gave Plaintiffs only a license to use the manuscript to create the screenplay.  Thus, just as in *Oddo*, where the plaintiff's license to the partnership to use his articles in the manuscript did not extend to defendant's using the articles to write a book, Defendants' license for Plaintiffs to use the manuscript to write the screenplay does not permit Plaintiffs to use the manuscript to create another distinct derivative work such as a movie.  Thus, if Plaintiffs create a movie based on the screenplay without Defendants' permission to use the underlying manuscript, Plaintiffs will infringe Defendants' copyright in the screenplay.  The Court,

therefore, cannot grant Plaintiffs a declaratory judgment that they are free to use the screenplay to make other derivative works without interference from Defendants.  Accordingly, the Court will grant Defendants summary judgment on this portion of Plaintiffs' declaratory-judgment claim.

### 4.    Quantum Meruit and Specific Performance

Plaintiffs aver that they are entitled to an award in an amount equal to the reasonable value of the services they rendered in creating the screenplay.  Further, they aver that the contract contemplated that the parties would undertake pre-production of the screenplay into a film and that Plaintiffs are entitled to an order requiring Defendants to allow Plaintiffs to complete tasks related to production of the screenplay into a movie.  Plaintiffs cannot recover under either theory.

First, a party is estopped from recovering on quantum meruit where there exists an express agreement.  *Willis v. Kemp*, 204 S.E.2d 486, 490 (Ga. Ct. App. 1974).  Here, there was an express contract to form a partnership to create the screenplay.  Defendants have performed their obligations of reimbursing Plaintiffs $8,000 and acting as editors.  In return, Plaintiffs wrote the screenplay and gained co-ownership of the

screenplay.  Because there is an express contract, Plaintiffs cannot recover for the reasonable value of their services in creating the screenplay.

Additionally, as explained above, the contract was not for the production of a movie and did not require the parties to perform any tasks related to producing a film.  Further, were Plaintiffs to license the screenplay for the purpose of making a film, they would infringe Defendants' copyright in the manuscript.  Thus, the Court cannot decree that Defendants must allow Plaintiffs to complete tasks related to production of the screenplay.

Accordingly, summary judgment for Defendants will be granted on both of these claims.

### 5.    Punitive Damages and Attorney's Fees

Plaintiffs also seek punitive damages and their attorneys' fees.  Defendants argue that Plaintiffs cannot recover either because their claims for breach of contract and breach of fiduciary duty fail.  Defendants are partly right.

The disposition of the above claims precludes Plaintiffs' request for punitive damages.  "[P]unitive damages under O.C.G.A. § 51-12-5.1 cannot be awarded where no actual damages are awarded." *Morris v. Pugmire*

*Lincoln Mercury, Inc.*, 641 S.E.2d 222, 225 (Ga. Ct. App. 2007); *accord*

*OFS Fitel, LLC v. Epstein, Becker and Green, P.C.*, 549 F.3d 1344, 1357 n.8

(N.D. Ga. 2008).  The Court has granted summary judgment to Defendants

on Plaintiffs' claims for breach of contract and breach of fiduciary duty,

resulting in no actual damages being awarded.  Consequently, Plaintiffs

cannot recover punitive damages, and the Court will grant Defendants

summary judgment on this claim.

However, Defendants have not pierced Plaintiffs' pleading on the

issue of attorney's fees because the only argument Defendants offered in

support of their contention that Plaintiffs cannot recover such fees is that

Defendants have prevailed on all of Plaintiffs' substantive claims.  But

Defendants did not prevail on all three of Plaintiffs' substantive claims; they

lost in part on Plaintiffs' claim for a declaratory judgment.[25]  Thus,

Plaintiffs' claim for attorney's fees incurred in connection with their claim

---

[25] Defendants seem to assume that Plaintiffs may recover attorney's fees only in conjunction with claims where damages are awarded.  However, in *Clayton v. Deverell*, 362 S.E.2d 364, 366 (Ga. 1987), the court specifically held that "the award of specific performance does not, as a matter of law, bar [a party] from recovering [attorney's fees under O.C.G.A. § 13-6-11]."  Further, there are myriad cases where parties have been allowed to seek litigation expenses under O.C.G.A. § 13-6-11 solely in conjunction with claims not seeking damages.  *See, e.g., Jones v. Forest Lake Vill. Homeowners Ass'n, Inc.*, 696 S.E.2d 453, 457 (Ga. 2010) (claim for declaratory relief and injunction); *Rice v. Lost Mountain Homeowners Ass'n, Inc.*, 655 S.E.2d 214, 214-15 (Ga. Ct. App. 2007) (claim for injunction); *Redfearn v. Huntcliff Homes Ass'n, Inc.*, 579 S.E.2d 37, 39 (Ga. Ct. App. 2003) (claim for injunction).

for a declaratory judgment regarding (1) their ownership of the screenplay, and (2) whether their copyright in the screenplay infringes the manuscript, remains viable, and the Court will allow Plaintiffs an opportunity to further brief this issue.

Plaintiffs are limited, however, to arguing recovery based on bad faith.  O.C.G.A. § 13-6-11 provides three grounds for the recovery of attorney's fees: (1) bad faith, (2) stubborn litigiousness, and (3) causing the plaintiff unnecessary trouble and expense.  As to the second and third bases for relief, it is an absolute defense that a bona fide dispute existed.  *See McLeod v. Robbins Ass'n*, 579 S.E.2d 748, 750 (Ga. Ct. App. 2003) (the existence of a genuine dispute or a bona fide controversy precludes an award of attorney's fees based on stubborn litigiousness or causing unnecessary trouble and expense); *4WD Parts Ctr. v. Mackendrick*, 579 S.E.2d 772, 778 (Ga. Ct. App. 2003) ("[A]ttorney fees were not authorized if the evidence showed that 'a genuine dispute exists—whether of law or fact, on liability or amount of damages, or on any comparable issue.'") (citing *Backus Cadillac-Pontiac, Inc. v. Brown*, 365 S.E.2d 540, 541 (Ga. Ct. App. 1988)).  Although Defendants did not ultimately prevail on their arguments regarding summary judgment, the Court finds that there was a bona fide

controversy as to Plaintiffs' claim for declaratory relief regarding copyrightability of a derivative work—an area of law that even the Eleventh Circuit has described as "rather swampy." *Montgomery*, 168 F.3d at 1290.

While the existence of a genuine dispute or a bona fide controversy precludes Plaintiffs from seeking an award of fees under O.C.G.A. § 13-6-11 on the grounds of stubborn litigiousness or causing Plaintiffs unnecessary trouble and expense, it does not foreclose an award of attorney's fees and expenses of litigation based on bad faith. *See Fid. Nat'l Bank v. Kneller*, 390 S.E.2d 55, 61 (Ga. Ct. App. 1989); *Windermere v. Bettes*, 438 S.E.2d 406, 409 (Ga. Ct. App. 1993). Therefore, despite the existence of a bona fide controversy, Plaintiffs may recover attorneys' fees by showing that Defendants acted in bad faith in conjunction with Plaintiffs' declaratory judgment claim.

Accordingly, the Court will allow Plaintiffs thirty days to file a brief and any evidence in support of any such claim, should they so desire. Defendants shall have twenty-one days from the date of Plaintiffs' filing within which to file a brief and any evidence in opposition thereto. Plaintiffs shall then have fourteen days to file a reply brief in support of their claim.

IV.   Conclusion

Plaintiffs' motion to exclude Blakesley's testimony and for sanctions [81] is GRANTED as set forth above.

Defendants' second motion for summary judgment [89] is GRANTED IN PART and DENIED IN PART.  Defendants are granted summary judgment as to Plaintiffs' claims for breach of fiduciary duty, breach of contract, quantum meruit, specific performance, punitive damages, and for a declaratory judgment that Plaintiffs are entitled to market and create a film version of the screenplay free from interference from Defendants. Defendants are also granted summary judgment in part on Plaintiffs' claim for attorney's fees.

Defendants are denied summary judgment as to Plaintiffs' claim for a declaratory judgment that (1) Plaintiffs own a copyright in the screenplay, and (2) Plaintiffs' copyright in the screenplay does not infringe Defendants' copyright in the manuscript.  Because there are no genuine disputes of fact regarding parts (1) and (2) of Plaintiffs' declaratory-judgment claim, Defendants have fourteen days from the date of this order to SHOW CAUSE why the Court should not enter judgment in favor of Plaintiffs as to those portions of Plaintiffs' declaratory-judgment claim.  Plaintiffs shall

have fourteen days from the date of Defendants' filing to file a brief in opposition to Defendants' filing.  Defendants shall then have seven days from the date of Plaintiffs' filing to file a reply in support of their show of cause.

Further, the parties shall file materials regarding Plaintiffs' motion for sanctions and claim for attorney's fees in compliance with the deadlines set forth above.

Finally, Defendants' motion for oral argument [109] is DENIED.

IT IS SO ORDERED this 30th day of January, 2013.

_____
Timothy C. Batten, Sr.
United States District Judge